**Merlin R. CHRISTIANSON, Relator,**

v.

**GEO. A. HORMEL & COMPANY, Commissioner of Jobs and Training, Respondents.**

No. C2-86-1969.

Court of Appeals of Minnesota.

April 21, 1987.

Michael H. Seibel, Austin, for relator.

James W. Cavanaugh, Corporate Atty., Geo. A. Hormel Co., Austin, for Geo. A. Hormel & Co.

Hubert H. Humphrey, III, Atty. Gen., Peter C. Andrews, Sp. Asst. Atty. Gen., St. Paul, for Com'r of Jobs and Training.

Considered and decided by LESLIE, P.J., and SEDGWICK and HUSPENI, JJ., with oral argument waived.

## OPINION

LESLIE, Judge.

Relator Merlin Christianson seeks review of a determination that his actions during a strike constituted misconduct disqualifying him from the receipt of unemployment compensation. We reverse.

## FACTS

Relator Merlin Christianson began working as a production worker for respondent Geo. A. Hormel & Company ("Hormel") in September 1982. He was a member of a labor union which called a strike against Hormel and organized a picket line effective August 16, 1985. Christianson participated in the strike and picket line activity.

On the morning of December 20, 1985 Christianson was on the picket line when management and other non-participants in the strike were reporting for work. Hor-

mel, anticipating violence at the strike site, had employees of its in-plant photo lab there videotaping the activity. The camera man was within the fences of Hormel, pointing the camera and some bright lights outward at the picketers. Christianson began making comments about the camera man and other individuals such as:

> Workers run this town—p**s on you—freeze to death—I'll remember your a**.
> I want you to remember my a**.
> We're going to get the camera guy today.
> Could be your worst f***cking nightmare, buddy.
> Want him to remember my a**.
> Little pr**k.
> Stick a jack up his a**.
> Stick a camera up his a**.
> We've got your face, buddy. Remember mine. It's going to be a f***ing nightmare.
> Take a look at that face, Dave—I'll remember your head.

Most of the comments were directed at other picketers, and none appeared to be direct threats at any Hormel management or employee. There were between 5 and 10 picketers at the site that morning and none of them were found to have committed any violence. It was a cold winter morning and the picketers spent their time pacing to keep warm.

On January 20, 1986 several striking employees engaged in acts of violence which damaged some property. A person whose car was damaged that day signed an affidavit stating it was Christianson who caused the damage. Hormel discharged Christianson from his job for strike-related activity, effective January 23, 1986. Hormel's personnel manager testified that Christianson was fired for his actions on both December 20 and January 20.

Christianson filed a claim for unemployment compensation, and a claims deputy from the Department of Jobs and Training granted him benefits, determining that he had been involuntarily separated from his employment for reasons other than misconduct. Hormel appealed, and a hearing was held before a Department referee.

At the hearing, Hormel introduced a videotape of the strike activity on December 20 and January 20, and a one page transcript outlining the taped events. The transcript stated that Christianson struck a vehicle. However, the videotape did not show anyone striking a vehicle. Hormel explained that the relevant portion of the tape had been inadvertently edited out. No other evidence was introduced which would establish that Christianson committed any violence. Ultimately, neither the referee nor the Commissioner found that Christianson struck any vehicles.

Hormel attempted to prove that Christianson had been involved in the January 20 incident. The witness whose car had been damaged that day testified that he signed an affidavit identifying Christianson as the person who caused the damage. However, the witness stated he didn't know who Christianson was, did not prepare the affidavit, and was "shook up", "mad", and "really didn't give a damn what [he] signed" that day. No one at the hearing could specifically identify Christianson as being present at Hormel on January 20.

Christianson testified and presented the testimony of his wife and a neighbor that he was not at Hormel on the morning of January 20. The referee found, and the Commissioner agreed that Christianson was not on the picket line on January 20.

The referee reversed the claims deputy's allowance of benefits, reasoning that Christianson's language exhibited hostility towards management personnel and employees who were exempt from union membership; and that the conduct exhibited a disloyalty to the employer which could not be excused as an inherent effect of picketing. The referee made no finding that Christianson struck any vehicles or committed any acts of violence.

On appeal, a Commissioner's representative affirmed, and adopted the referee's findings in full. The Commissioner also reasoned in an accompanying memorandum that Christianson's conduct could easily have incited or encouraged other persons on the picket line to likewise make threat-

ening remarks against the employer, and such conduct could easily have led to physical violence and property destruction. Although neither the referee nor the Commissioner made any findings that Christianson or other picketers committed acts of violence, the Commissioner's memorandum did note that "[t]here is evidence in the record that on December 20, 1985, vehicles were hit by persons on the picket line at the employer's place of business".

## ISSUE

Did Christianson's actions on December 20 constitute misconduct sufficient to disqualify him from the receipt of unemployment compensation benefits?

## ANALYSIS

In reviewing a Commissioner's determination, our scope of review is limited to determining whether that determination is reasonably supported by the record. *White v. Metropolitan Medical Center*, 332 N.W.2d 25, 26 (Minn.1983). Generally, for unemployment compensation purposes, an employee who is on strike is not deemed to have quit his employment; rather, the employer-employee relationship continues. *Ayers v. Nichols*, 244 Minn. 375, 380, 70 N.W.2d 296, 299 (1955). During the course of the strike, the employee is disqualified from receiving unemployment benefits, but if, upon the conclusion of the strike, the employee is not reemployed, he is entitled to receive unemployment compensation benefits unless for some reason he is disqualified from receiving those benefits. *See Ayers*, 244 Minn. at 380–81, 70 N.W.2d at 299; Minn.Stat. § 268.09, subd. 3 (1986).

As in other situations, where strike-related conduct is involved, the employer has the burden of proving that the employee's actions constituted misconduct disqualifying him from the receipt of unemployment compensation. *Johnson v. Ford Motor Co.*, 289 Minn. 388, 394, 184 N.W.2d 786, 790 (1971). For Christianson to be disqualified from receipt of unemployment compensation, his actions must fall within the definition of "misconduct":

[T]he intended meaning of the term "misconduct" * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed "misconduct."

*Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973).

Christianson claims his actions on the picket line on December 20 did not constitute misconduct within the meaning of *Tilseth*. The only reported Minnesota case involving strike related misconduct is *Tester v. Jefferson Lines*, 358 N.W.2d 143 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. Mar. 13, 1985). In *Tester*, bus drivers employed by Greyhound Lines had been engaged in a strike, and union members of Jefferson Lines had been asked to support the strike and picket the Greyhound terminal. Due to the strike, Jefferson's management personnel drove the buses across the picket line to and from the Greyhound bus terminal and Jefferson's garage.

Tester, a Jefferson employee and union member, was on the Greyhound picket line one morning before his regularly scheduled shift began. Jefferson's Shop Superintendent, Albert Koerber, and its Director of Safety and Scheduling, Arthur Sterrett, had driven buses to the depot and were preparing to return to the Jefferson garage, when Tester yelled "Koerber you f***cking scab b*****d". Later that day, when Koerber was attempting to leave the Greyhound terminal, a number of picketers, including Tester, blocked his bus. A policeman had to push Tester out of the

way so that the bus could exit. Tester was discharged and, on appeal, this court affirmed the denial of unemployment compensation benefits, reasoning:

> The employer had a right to expect Tester to refrain from uttering unprovoked obscenities at management personnel and from actively obstructing the employer's buses.
>
> \*   \*   \*   \*   \*   \*
>
> The strike was not against Tester's employer, and his conduct cannot be excused as normal picket-line activity. Because both incidents occurred in presence of other employees and could have incited other aggressive behavior, they were likely to interfere with the employer's business.

*Id.* at 145–46 (citations omitted).

■ Christianson's picket line activity and the circumstances surrounding the activity sufficiently distinguish this case from *Tester.* Christianson's conduct, although hardly exemplary, amounted to language alone. Christianson was not blocking any vehicles from passing. The strike was against his own employer; thus, a certain amount of conduct can be excused as normal picket line activity. Although no strike is without heated emotions, this strike was particularly volatile. Furthermore, Hormel, by stationing its camera man on the picket line and shining bright lights at the picketers, contributed to the hostile atmosphere. Only 5 to 10 picketers were present at the strike site and Christianson's comments were unlikely to incite violence. There was no credible evidence of any violence on the picket line that day, and neither the referee nor the Commissioner found that Christianson or any other picketer committed violence or struck any vehicles.

Additionally, Hormel gave notice of discharge to Christianson over a month after the December 20 activity. Hormel's personnel manager testified that Christianson was fired for both the December 20 and January 20 incidents. Christianson was not on the picket line on January 20. Thus he was discharged for acts he did not commit. The personnel manager did state earlier at the hearing that Christianson was discharged for his language on December 20 alone. However, this testimony conflicts with the fact that Hormel waited to fire Christianson until three days after the January 20 incident.

Christianson's comments on December 20 do not amount to the conduct found in *Tester.* His actions do not constitute misconduct within the meaning of *Tilseth,* and he is therefore entitled to receive unemployment compensation.

## DECISION

The record does not support the decision of the Commissioner of Jobs and Training that relator's actions constituted misconduct disqualifying him from the receipt of unemployment compensation.

Reversed.

HUSPENI, Judge (dissenting).

I respectfully dissent and would affirm the Commissioner. In my opinion, the facts of this matter are not sufficiently distinguishable from those in *Tester v. Jefferson Lines,* 358 N.W.2d 143 (Minn.Ct. App.1984), *pet. for rev. denied,* (Minn. Mar. 13, 1985) to sustain the analysis of the majority. I believe *Tester* must control.